## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOHN L. TEASLEY,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00031 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: Pamela Meade Sargent |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, John L. Teasley, ("Teasley"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Teasley protectively filed applications for DIB and SSI on February 12, 2018, alleging disability as of June 30, 2016, due to pain in his neck, shoulder, lower back and hands; difficulty reading and writing; "nerves;" depression; and anxiety. (Record, ("R."), at 12, 221-22, 225-30, 251, 280.) The claims were denied initially and on reconsideration. (R. at 128-30, 135-37, 141-45, 147-52, 154-56.) Teasley requested a hearing before an administrative law judge, ("ALJ"). (R. at 157-58.) A hearing was held on September 13, 2019, at which Teasley was represented by counsel. (R. at 40-66.)

By decision dated October 11, 2019, the ALJ denied Teasley's claims. (R. at 12-28.) The ALJ found Teasley met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2021. (R. at 14.) The ALJ found Teasley had not engaged in substantial gainful activity since June 30, 2016, the alleged onset date. (R. at 14.) The ALJ determined Teasley had severe impairments, namely lumbago; cervical degenerative disc disease; depression; and intellectual disability with functional illiteracy, but he found Teasley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.)

The ALJ found Teasley had the residual functional capacity to perform medium[2] work, except he could lift and carry items weighing 25 pounds occasionally, and he could not be exposed to unprotected heights; he was limited to simple instructions and tasks that could be learned in 30 days or less; he could have no more than occasional changes in the work setting; he could not perform production rate or pace work; and he could have not interaction with the public. (R. at 18.) The ALJ found Teasley was unable to perform any of his past relevant work. (R. at 26.) Based on Teasley's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Teasley could perform, including the jobs of a wall cleaner, a cleaner II and a sweeper/cleaner. (R. at 26-27.) Thus, the ALJ concluded Teasley was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 27-28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Teasley pursued his administrative appeals, (R. at 213-15), but the Appeals Council denied his request for review. (R. at 1-5.) Teasley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Teasley's motion for summary judgment filed May 3, 2021, and the Commissioner's motion for summary judgment filed May 27, 2021.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

*II. Facts*

Teasley was born in 1964, (R. at 26, 221, 225), which, at the time of his alleged onset date, classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d), and at the time of the ALJ's decision, classified him as a "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e). He has a fifth-grade education,[3] stating he quit school when he was 12 years old to mow lawns. (R. at 47.) Teasley has past work experience as a core driller and a laborer, but was laid off, and then he went to work briefly installing heating, ventilation and cooling systems. (R. at 47, 62.) Prior to that, there was a 15-year gap in his work history, and Teasley testified he was in and out of incarceration for a long period of time. (R. at 49.) He stated that over the past few years he had tried starting a lawn care business and doing security work, but those jobs did not work out. (R. at 50.) Teasley stated it was difficult to obtain a job due to his criminal record. (R. at 51.) He stated he had used Percocet, suboxone and marijuana illegally over the past two years, but had not used them in six months. (R. at 51.) Teasley stated he was incarcerated in a psychiatric facility for three years beginning at age 14 or 15, because a judge found him to be a "danger to everyone and unfit for society." (R. at 58, 541.) Teasley stated he could not read. (R. at 60.)

Rick Bradley, a vocational expert, was present and testified at Teasley's hearing. (R. at 62-65.) Bradley classified Teasley's past work as a core driller as

---

[3] Teasley indicated on his Disability Report that he completed the seventh grade, (R. at 252); however, he testified at his hearing that he completed only the fifth grade. (R. at 47.)

medium, skilled[4] work, but found Teasley performed it at the heavy[5] exertional level. (R. at 62.) He stated Teasley's past work as a heating and air conditioning helper was classified as heavy, skilled work.[6] (R. at 62-63.) Bradley was asked to consider a hypothetical individual of Teasley's age, education and work history, who had the residual functional capacity to perform medium work, except he could lift and carry items weighing 25 pounds both occasionally and frequently, and he could not be exposed to unprotected heights, such as ladders, ropes or scaffolds; he was limited to simple instructions and tasks that could be learned in 30 days or less; he could have no more than occasional changes in the work setting; he could not perform production rate or pace work; and he could have no interaction with the public. (R. at 63-64.) He stated such an individual could not perform Teasley's past work, but other work existed in significant numbers such an individual could perform, including jobs as a wall cleaner, a cleaner II and a sweeper, cleaner. (R. at 64.) Bradley stated these jobs would be performed standing and "not lifting as much." (R. at 64.) He stated these jobs would not require lifting items weighing more than 25 pounds. (R. at 65.) Bradley stated there would be no jobs available should the same hypothetical individual be unable to relate to co-workers or supervisors; to maintain attention and concentration even for simple tasks; to

---

[4] Bradley stated, according to the Dictionary of Occupational Titles, ("DOT"), the specific vocational preparation, ("SVP"), rating for this job was level 6, indicating the amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance was over one year up to and including two years. *See* DOT, Rotary Driller, 930.382-026 (4th ed. rev. 1991).

[5] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2020).

[6] Bradley stated, according to the DOT, the SVP rating for this job also was level 6. (R. at 63.) *See* DOT, Environmental-Control-System Installer-Servicer Helper, 637.664-010.

behave in a stable manner; to relate appropriately in social situation; and who would miss more than two days of work a month. (R. at 64-65.)

In rendering his decision, the ALJ reviewed records from Eric Oritt, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Norton Community Hospital; Johnson City Medical Center; William A. Davis Clinic; Ohio State University Medical Center; Clinch River Health Services, Inc., ("Clinch River"); The Health Wagon; Holston Valley Medical Center; and Melinda M. Fields, Ph.D., a licensed psychologist.

On January 8, 2018, Teasley presented to the emergency department at Norton Community Hospital with complaints of neck, back and left-sided pain and shortness of breath following a motor vehicle accident. (R. at 333-41.) A CT scan of Teasley's head showed a mild acute subdural hemorrhage and a scalp hematoma. (R. at 321.) Right shoulder imaging was normal, (R. at 323), and a lumbar spine x-ray showed no acute abnormality, mild scattered degenerative spurring, minimal narrowing at L3-4 and L4-5 and no compromise of the neural canal. (R. at 327.) Cervical spine imaging showed aligned facet joints and no acute cervical fracture, (R. at 329), and chest x-rays showed multiple rib fractures. (R. at 319.)   Teasley was transferred to Johnson City Medical Center for admission. (R. at 350-417.)

Teasley was admitted to the intensive care unit at Johnson City Medical Center for monitoring of a possible subdural hematoma. (R. at 350.) On January 9, 2018, a CT scan did not show any traumatic brain injury or hemorrhage. (R. at 350, 360.) Chest x-rays dated January 12, 2018, showed small left pleural effusion;

persistent bibasilar opacities, which may be secondary to atelectasis, contusion or pneumonia; and multiple left rib fractures. (R. at 364.) Teasley was hospitalized multiple days due to difficulty controlling his pain with medications. (R. at 350-51.) During his hospitalization, he had functional range of motion in all extremities, good strength and good spine range of motion. (R. at 384, 388-89, 392-93.) He also was noted to be alert, oriented and cooperative, with good insight and a functional attention span. (R. at 384, 389, 392.) He remained hemodynamically stable, he was able to mobilize without any significant help, and he was deemed stable for discharge on January 12, with restrictions on heavy lifting for four weeks. (R. at 351.)

On March 19, 2018, Teasley established care at the William A. Davis Clinic, where he reported headaches on the left side, left neck and shoulder pain and depression. (R. at 421-29.) On examination, Teasley was alert; he had a normal gait; he had a euthymic mood and appropriate affect; and his neurological exam was normal. (R. at 423-24.) Teasley was diagnosed with nicotine dependence, unspecified; major depressive disorder, single episode, mild; pleurodynia; and headache. (R. at 424.) Teasley was encouraged to stop smoking and to take Advil or Tylenol occasionally for rib pain. (R. at 424, 426.) Teasley returned to the clinic on March 27, 2018, with complaints of neck and back pain; left eye pressure; blurry vision and thoughts of self-harm. (R. at 430-37.) On examination, Teasley had a normal gait; his lumbar spine was stable and revealed normal lumbar lordosis, tenderness with deep palpation and normal range of motion; he had appropriate judgment and good insight; his mood was sad with a flat affect; and he had intact recent and remote memory. (R. at 433.) He was prescribed medication

for back pain and depression, and he was referred to behavioral health.[7] (R. at 435.)

On May 1, 2018, Teasley established behavioral health services with Alysia Hoover-Thompson, Psy.D., a clinical psychologist with the William A. Davis Clinic. (R. at 438-42.) Teasley complained of depression, adjustment issues and anxiety. (R. at 438.) He recounted his criminal history, which included multiple attempted murders, felonious assaults and armed robbery, and he reported that he had dropped out of school in the fourth grade and could not read or write. (R. at 439-40.) He stated he mostly watched television and drove around, and he complained of passive suicidal ideation, irritability and anger. (R. at 440.) Teasley reported using marijuana and smoking a pack of cigarettes daily. (R. at 440.) Hoover-Thompson reported Teasley was well-groomed; he had a depressed mood; his behavior was congruent with mood and situation; he had normal eye contact; his judgment and insight were fair; his speech was normal; and he denied hallucinations, delusions and paranoia. (R. at 441.) While Teasley reported passive suicidal ideation, he denied any intent to harm himself. (R. at 441.)

On May 4, 2018, Teasley reported continued problems with his right ear and left eye. (R. at 443-48.) He reported he had stopped taking all medications due to side effects. (R. at 443.) On examination, Teasley had a normal gait; his neurological examination was normal; and his mood was low with a flat affect. (R. at 445.) He was prescribed Celexa. (R. at 447.)

---

[7] At his behavioral health intake appointment, Teasley stated his attorney wanted him to be seen. (R. at 438.)

On July 18, 2018, Eric Oritt, Ph.D., a state agency psychologist, completed a psychiatric review technique form, ("PRTF"), finding Teasley suffered from severe depressive, bipolar and related disorders. (R. at 72-73.) He opined Teasley had no limitations on his ability to understand, remember or apply information; moderate limitations on his ability to interact with others and to concentrate, persist or maintain pace; and mild limitations on his ability to adapt or manage himself. (R. at 72.)

That same day, Oritt also completed a mental assessment, indicating Teasley had moderate limitations in his ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 76-77.) Oritt stated Teasley's work-related mental abilities were, otherwise, not significantly limited. (R. at 76-77.) Oritt opined Teasley could perform simple, routine tasks with minimal social contact. (R. at 77.)

Also on July 18, 2018, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, finding Teasley could lift and carry items weighing up to 25 pounds; he could stand, walk and/or sit six hours in an eight-hour workday; and he could frequently climb ladders, ropes or scaffolds and crawl. (R. at 74-75.) He indicated no manipulative, visual, communicative or environmental limitations. (R. at 75.)

-9-

On September 10, 2018, Dr. William Rutherford, Jr., M.D., another state agency physician, completed a medical assessment, finding Teasley could lift and carry items weighing up to 25 pounds; he could stand, walk and/or sit six hours in an eight-hour workday; and he could frequently climb ladders, ropes or scaffolds and crawl. (R. at 102-03.) He indicated no manipulative, visual, communicative or environmental limitations. (R. at 103.)

On September 11, 2018, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding Teasley suffered from severe depressive, bipolar and related disorders. (R. at 100-01.) He opined Teasley had no limitations on his ability to understand, remember or apply information; moderate limitations on his ability to interact with others and to concentrate, persist or maintain pace; and mild limitations on his ability to adapt or manage himself. (R. at 100-01.)

That same day, Leizer also completed a mental assessment, indicating Teasley had moderate limitations in his ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 104-05.) Leizer stated Teasley's work-related mental abilities were, otherwise, not significantly limited. (R. at 104-05.) Leizer opined Teasley could perform simple, routine tasks with minimal social contact. (R. at 105.)

On September 27, 2018, Teasley participated in individual therapy at Clinch River for complaints of depression; anxiety; decreased attention span and concentration; moderate irritability and anger; problems being in crowds; and difficulty sleeping. (R. at 499-502.) Karen Odle, L.P.C., a licensed professional counselor, reported Teasley's mood and affect were calm; thought process was clear; thought content was appropriate; concentration and judgment were "ok;" and insight was fair. (R. at 502.) Teasley reported he sometimes wanted to die, but he had no plan. (R. at 502.)

On September 27, 2018, Teasley established care with Gary Gilliam, F.N.P., a family nurse practitioner with Clinch River, for complaints of low back, right neck and shoulder pain and depression over losing his job. (R. at 509-13.) On examination, Teasley was alert and oriented, and while he had vertebral spine tenderness and lumbar paraspinal spasm, his gait was normal; he had normal motor strength and sensation; his straight leg raising tests were negative bilaterally; he had normal range of motion of the shoulder joint; and he had adequate grooming, normal eye contact and pleasant mood. (R. at 510-11.) X-rays of Teasley's lumbar spine showed moderate multilevel degenerative spondylosis. (R. at 516.) X-rays of Teasley's cervical spine showed straightening of the lordotic curvature suggesting muscle spasm and moderately severe multilevel degenerative spondylosis with associated mild multilevel subluxations. (R. at 517.) On October 23, 2018, Teasley complained of low back and neck pain and financial stressors. (R. at 505-08.) His examination remained unchanged. (R. at 506-07.)

In November 2018, March 2019, April 2019 and May 2019, Teasley saw Odle and reported varying levels of depression and anxiety. (R. at 498, 531-33.)

On examination, he generally had a depressed mood and subdued affect, but intact thought processes and fair to good insight and judgment. (R. at 498, 531-33.)

On May 17, 2019, Teasley saw Gilliam for complaints of depression and low back and neck pain. (R. at 523-29.) On examination, Teasley was alert and oriented, and while he had vertebral spine tenderness and lumbar paraspinal spasm, his gait was normal; he had normal motor strength and sensation; his straight leg raising tests were negative bilaterally; he had normal range of motion of the shoulder joint; and he had adequate grooming, normal eye contact and a pleasant mood. (R. at 525.) He was prescribed a new anti-depressant and pain medication, and his muscle relaxant dose was increased. (R. at 526.)

On May 20, 2019, Odle completed a mental assessment, finding Teasley had absent or minimal limitations on his ability to follow work rules, and he had slight limitations on his ability to function independently. (R. at 535-37.) She opined he had a satisfactory ability to use judgment in public; to understand, remember and carry out simple instructions; and to maintain personal appearance. (R. at 535-36.) Odle found Teasley had serious limitations on his ability to relate to co-workers; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out detailed instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 535-36.) She found Teasley had no useful ability to deal with the public; to deal with work stresses; and to understand, remember and carry out complex job instructions. (R. at 535-36.) Odle found Teasley would be absent from work more than two days a month. (R. at 537.) She based this opinion on Teasley's diagnosis of severe major depression. (R. at 535-37.)

On June 11, 2019, an MRI of Teasley's lumbar spine showed degenerative changes primarily manifested as mild multilevel facet hypertrophy and minor disc bulges, but no significant central canal stenosis. (R. at 538-39.) Findings of mild neuroforaminal stenosis at most levels were of uncertain clinical significance. (R. at 539.)

On June 19, 2019, Teasley saw Odle and reported depression and anxiety. (R. at 551.) He also reported increased stressors associated with helping care for his brother-in-law and increasing bills. (R. at 551.) Odle reported Teasley had a depressed mood and subdued affect, but intact thought processes and good insight and judgment. (R. at 551.) On July 24, 2019, Teasley saw Odle and reported depression and anxiety. (R. at 552.) He also reported increased stressors associated with the inability to pay his bills. (R. at 552.) Odle reported Teasley had a depressed mood and subdued affect, but intact thought processes and good insight and judgment. (R. at 552.)

On July 24, 2019, Teasley saw Gilliam for complaints of depression and lower back and neck pain. (R. at 554-57.) On examination, Teasley was alert and oriented, and while he had vertebral spine tenderness and lumbar paraspinal spasm, his gait was normal; he had normal motor strength and sensation; his straight leg raising tests were negative bilaterally; he had normal range of motion of the shoulder joint; and he had adequate grooming, normal eye contact and a pleasant mood. (R. at 555-56.)

On August 22, 2019, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Teasley at the request of Teasley's attorney. (R. at 540-46, 550.) Fields noted Teasley was cooperative; he put forth adequate effort; he had adequate eye

contact; his mood was depressed with restricted affect; his stream of thought was organized and logical; he had no perceptual disturbances; but his judgment was impaired. (R. at 543.) She found Teasley could recall three of four words immediately, but none after a delay; he had a very slow pace; and he reported significant symptomatology with respect to both depression and anxiety. (R. at 544-45.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Teasley obtained a full-scale IQ score of 75. (R. at 544.) Teasley obtained significantly below average scores in all areas of achievement on the Wide Range Achievement Test – Revision Four, ("WRAT-4"). (R. at 545.) The Beck Depression Inventory, ("BDI"), and the Beck Anxiety Inventory, ("BAI"), were indicative of significant depressive and anxiety-related symptomatology. (R. at 545.) Fields diagnosed major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; borderline intellectual functioning; and antisocial personality disorder. (R. at 546.) She recommended continued psychiatric treatment and regular psychotherapy. (R. at 546.)

That same day, Fields completed a mental assessment, finding Teasley had a satisfactory ability to interact with supervisors; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 547-49.) She found Teasley was seriously limited in his ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 547-48.) Fields also found Teasley would be absent from work more than two days a month. (R. at 549.)

-14-

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Teasley argues the ALJ erred by improperly determining his physical residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Teasley contends the ALJ erred in finding he could perform medium work because the ALJ limited him to

lifting no more than 25 pounds occasionally, and the full range of medium work requires the ability to lift up to 50 pounds occasionally. (Plaintiff's Brief at 5.) Teasley also argues the ALJ erred by improperly determining his mental residual functional capacity by rejecting the opinions of Fields and Odle and by relying on the opinions of the state agency psychologists. (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8]

_____

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2020).

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[9] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

Teasley argues the ALJ erred by improperly determining his physical residual functional capacity by finding he could perform medium work when the ALJ limited him to lifting no more than 25 pounds occasionally. (Plaintiff's Brief at 4-5.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2020). The residual functional capacity assessment is based on all the relevant evidence, including the medical records, medical source opinions and the

individual's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The court notes Teasley does not argue that he was more physically limited than the ALJ found. Rather, he argues the ALJ erred in finding he could perform medium work because the ALJ limited him to lifting no more than 25 pounds occasionally, which would limit him to light[10] work, and, thus, the ALJ should have applied Rule 202.02 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), to find him disabled. (Plaintiff's Brief at 5.) The ALJ instead applied Rule 203.12 to find Teasley not disabled. (R. at 27.) Social Security Ruling 83-12 directs how ALJs should handle situations in which a claimant falls between two exertional levels, e.g., between medium and light work. *See* Social Security Ruling, ("S.S.R."), 83-12, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1992).

According to S.S.R. 83-12, because "more difficult judgments are involved" as to the sufficiency of the remaining occupational base where the residual functional capacity falls between two exertional levels, it is advisable to obtain vocational specialist assistance. S.S.R. 83-12, 1983 WL 31253, at *3. The ALJ in this case had a vocational expert testify at Teasley's hearing. (R. at 62-65.) The ALJ posed a hypothetical to the vocational expert, which included Teasley's work history and residual functional capacity, including the ability to perform medium work but with a maximum lifting capacity of 25 pounds. (R. at 63-65.) The

---

[10] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

vocational expert responded with three examples of medium jobs that could be performed with those limitations. (R. at 64-65.)

The ALJ asked for clarification regarding lifting, requesting the vocational expert confirm that, in his opinion, "these [medium] jobs that you have identified really don't require more than 25 pounds lifting." (R. at 65.) The vocational expert explicitly confirmed the jobs identified fit this reduced lifting limitation. (R. at 65.) *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 537-38 (6th Cir. 2001) (upholding ALJ's step five finding when the residual functional capacity for lifting up to 30 pounds fell between medium and light, and the ALJ relied on vocational expert testimony for jobs that met that residual functional capacity); *Martin v. Barnhart*, 240 F. App'x 941 (3d Cir. 2007) (upholding ALJ's step five finding when residual functional capacity fell between light and sedentary, and the ALJ elicited vocational expert testimony regarding unskilled light jobs that the plaintiff could perform with a residual functional capacity of a restricted range of light work); *Hence v. Astrue*, 2012 WL 6691573, at *8 (E.D. Va. Nov. 30, 2012) (collecting cases and finding that when an ALJ found the plaintiff capable of a residual functional capacity falling between the light and sedentary exertional levels, the ALJ appropriately utilized a vocational expert to assess the impact, if any, on the occupational base of light work in light of plaintiff's additional limitations). Based on this, I find the ALJ properly abided by the policy of S.S.R. 83-12 by obtaining vocational expert testimony. The vocational expert's testimony provides substantial evidence to support the ALJ's finding that a significant number of medium exertional jobs exist in the economy which Teasley can perform.

Teasley also argues the ALJ erred by improperly determining his mental residual functional capacity by failing to give full consideration to the opinions of Fields and Odle and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5-6.) The ALJ found Teasley had the residual functional capacity to perform a limited range of medium work that was limited to simple instructions and tasks that could be learned in 30 days or less; that required no more than occasional changes in the work setting; that did not require production rate or pace work; and that did not require interaction with the public. (R. at 18.)

In making his residual functional capacity finding, the ALJ stated he found Odle's opinion "not persuasive" because it was not supported by her own records. (R. at 25.) The ALJ noted that, while Teasley reported moderate depression and anxiety, Odle's records indicated his examinations generally were unremarkable, except for having a depressed mood and subdued affect. (R. at 25.) Based on this, the ALJ found Odle's records did not support her extreme limitations. (R. at 25.) The record routinely shows Teasley was alert, oriented and cooperative; he made adequate eye contact; he had normal speech; he had appropriate judgment and fair to good insight; he had a functional attention span; and he had intact recent and remote memory. (R. at 384, 389, 392, 423-24, 433, 441, 498, 510, 525.) The ALJ conceded Teasley's behavior as a teenager was extreme, but he noted the evidence did not reflect such extreme behavioral issues in later years. (R. at 25.) In addition, the ALJ noted Teasley did not lose his drilling job based on psychological reasons, but was laid off. (R. at 25.)

Similarly, the ALJ noted Fields saw Teasley on one occasion, and the record did not show that his mental impairments had prevented him from performing his

past work or that his impairments had worsened to a great degree since performing that work. (R. at 25-26.) The ALJ noted many of Fields's examination findings were normal, including organized and logical stream of thought and no evidence of perceptual disturbance. (R. at 25-26, 543.) He compared Fields's opinion to the overall record, which reflected mostly normal mental status findings; thus, he found her opinion "not persuasive." (R. at 26.) Teasley obtained a full-scale IQ score of 75, and Fields diagnosed borderline intellectual functioning. (R. at 544, 546.) Fields opined Teasley had a satisfactory ability to understand, remember and carry out simple job instructions. (R. at 547-48.) This is consistent with the opinions of the state agency psychologists, who found Teasley could perform simple, routine tasks. Thus, the ALJ found Teasley had the residual functional capacity to perform work that was limited to simple instructions and tasks that could be learned in 30 days or less. (R. at 16, 18.)

The ALJ found the state agency psychologists' opinions that Teasley could perform simple, routine tasks "persuasive." (R. at 25, 77, 105.) He noted that, although the state agency psychologists limited Teasley to minimal social contact, the record only indicated difficulty dealing with the public. (R. at 25, 77, 105.) As noted above, the record routinely shows Teasley was alert, oriented and cooperative; he made adequate eye contact; he had normal speech; he had appropriate judgment and fair to good insight; he had a functional attention span; and he had intact recent and remote memory.

The ALJ also noted Teasley professed that his mental impairments were longstanding, but they had not prevented him from working in the past in a skilled job and that many of his reports of depression and anxiety were based on situational issues, such as the loss of his job and lack of finances. (R. at 24-25.)

And, as the ALJ recounted, Teasley's treatment during the relevant period never involved hospitalization. (R. at 25.) At most, Teasley took medication and saw a counselor once a month or so. Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his mental residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.    Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence exists in the record to support the Commissioner's finding that Teasley was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Teasley's motion for summary judgment and grant the Commissioner's motion for summary judgment.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    November 30, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE